MERLE H. BRONSON, AS SOLE EXECUTOR OF THE LAST WILL AND ESTATE OF CHAS. R. BRONSON, NOW DECEASED, AND T. H. HERRIMAN, PLAINTIFF AND APPELLANT, v. JOHN D. GILLAN, E. O. RIECKHOFF, JOHN SCHNITZMEIER, AND EDWARD SCHNITZMEIER, DEFENDANTS AND RESPONDENTS.

No. 9314.
Submitted February 20, 1957. Decided April 18, 1957.
309 Pac. (2d) 625.

Messrs. Hoffman & Cure, Great Falls, for appellant.

Messrs. Burns & Thomas, Chinook, for respondents.

Mr. Harvey B. Hoffman and Mr. Harry L. Burns argued orally.

MR. JUSTICE CASTLES:

This is an appeal from a judgment for the defendants. Plaintiffs sought to impress a trust upon an 87½ percent interest in oil and gas leases that were entrusted to Gillan, one of the defendants, under a declaration of trust; or, in the alternative to have a judgment for damages in lieu thereof for the reasonable value of their interest in the leases under the trust.

The record is a somewhat voluminous one, 790 pages, but in the view of this court, the fact situation can be much simplified. Essentially for the purpose of this opinion the facts are these. Plaintiffs Bronson and Herriman were co-partners, doing business as the Midwest Drilling Co., and in their individual rights, in the oil and gas prospecting areas of Hill County, Montana. Oil and gas leases were secured from various landowners on some 57,000 acres on what was called the Cassady structure, plaintiffs taking the leases in the name of one, A. H. Raymond, who then assigned the leases to the Midwest Drilling Co.

The plaintiffs and one of the defendants, E. O. Rieckhoff, set about to promote the development of the area known as the Cassady structure. They formed a trust, with a trustee, Gillan, one of the defendants, to hold the trust *cestui*, which consisted

of leases on some 22,000 acres of the above 57,000 acre holding. Essentially all of the oil and gas leases on the 57,000 acres were taken on the same form, known as Form No. 88-A, Rocky Mountain form, with specified royalty reservation, containing the following provisions:

"If a test well is not drilled on Lessor's land, but is drilled on other lands on said structure then (unless the first well is a dry hole), Lessee shall commence to drill a well on Lessor's land within two years from date hereof, and shall prosecute the same with reasonable diligence, or else pay to Lessor a rental as above provided for, for each and every period of twelve months the drilling of such well shall be delayed after the expiration of said second year. But if such a test well or other well is drilled on Lessor's land described herein, whether the same be a producing well or a dry hole, it shall be in full satisfaction of all rental due hereunder (though not of royalties) for the full term of this lease, but if said well is a commercial gas well, then said rentals are to be extended automatically as hereinafter provided.

"If the well drilled is a dry hole, Lessee shall have twelve months' additional time from its completion, without rental, to commence a second well, which shall be continued with reasonable diligence; and if such second test well be commenced then all the terms and conditions of this lease shall be extended the same as if said well were the first well commenced. Provided, however, that, if said test well is drilled with reasonable diligence and in the manner above prescribed and gas only is found in paying quantities, then in the event no market from a major gas line is available to purchase gas at the prevailing market price in Montana, on or before the two year term above provided has expired, then the time of payment of rentals hereunder is automatically extended until 30 days after such gas market is available, within which last mentioned time a well shall be commenced on the above-described premises or rental paid as above set forth."

As previously related, the Midwest Drilling Co. assigned part of the leases it held on Cassady structure, some 22,000 acres out

of some 57,000 acres, to the trustee Gillan, who was a practicing attorney. A declaration of trust was prepared and signed with these provisions:

"(a) The trustee shall have the power and exclusive authority to make any contracts for the drilling of a well or wells and shall have the authority to make a contract that he may deem advisable for the best interests of the trust hereby created as to the sale and disposal of the products produced from said leases, and shall have authority when it is deemed advisable for the best interests of the trust to dispose of the entire trust estate.

"(b) Ten per cent (10%) interest to be sold for the financing of the first well. In the event that after the first well is drilled, it is necessary to sell interest in the trust, to finance the drilling of additional wells, such interest shall come out of the trust estate and the interest set forth hereinabove, shall remain the same in the trust estate and such assignments as may hereafter be sold for financing of additional wells after the ten percent (10%) has been disposed of, shall come out of the interest remaining in the proportion set forth hereinabove.

"(c) The purpose for which this trust is created is to drill a well or wells on the lands herein described for the production of oil or gas, and for that purpose the trustees may sell such interests or percentage in such leases as he may consider necessary or advisable, and may transfer such interests or percentages in such leases for money or services as he may consider necessary or advisable for the best interests of the trust hereby created."

The defendants, Schnitzmeiers, were the owners of the large bulk of the land transferred to the trust, owning some 20,000 acres of the 22,000 acres involved. These defendants entered into the same lease agreement as was held on the 57,000 acres on Cassady structure, reserving a 12½ percent landowners' royalty. Defendants Schnitzmeier were largely instrumental in getting the areas leased and paid plaintiff Bronson his expenses to do the leasing.

After the formation of the trust, promotional activities were

had which consisted of selling shares in the trust for finances to proceed with drilling. The previously mentioned leases which made up the trust lands can be listed as follows: Schnitzmeier, dated January 2, 1946; Lenhart, dated May 31, 1944; Gorder, dated May 31, 1944; Shannon, dated January 10, 1946; Shepherd, dated June 9, 1944; Twin City Land Co., dated March 14, 1946; Speaker, dated July 15, 1944; and Neuhas, dated June 9, 1944.

The declaration of trust was entered into in May, 1946. The primary term of all the aforementioned leases was five years. No rentals were ever paid on the leases involved (other than one small payment on one lease not essential to this opinion). Prior to the formation of the trust in December, 1945, an old cable tool drilling rig was moved onto the Schnitzmeier lease. A so-called validating well was commenced January 11, 1946, drilled to 200 feet and abandoned due to caving and lack of casing. In June, 1946, a new hole was commenced on the Schnitzmeier lease a short distance from the first. This well was drilled to a depth of 4,140 feet by the latter part of 1949, and was abandoned as a dry hole. There was some contradictory evidence as to whether or not oil was discovered in this well, but the trial court found that there was not, and a review of the record justifies this finding. Except as to these two holes, the one in January, 1946, drilled to a depth of 200 feet, and the 4,140 foot dry hole drilled between June, 1946, and the latter part of 1949, no other drilling was ever done on the trust lands.

The development work by plaintiff Bronson shifted to other lands on the Cassady structure, with undisclosed associates participating. He drilled some seven wells, the closest one being *several miles distant from the trust lands.* From about the time of the formation of the trust, except for a brief time, plaintiff Bronson had nothing more to do with the trust lands and showed no interest in them. Plaintiff Herriman worked as a driller on the second hole during 1946, but thereafter took no interest in it.

Finally in June of 1950, the trustee Gillan released the oil

and gas leases of record held by him as trustee. At that time, the Schnitzmeier lease had run for a period of four years, five months; the Lenhart, six years, one month; the Gorder, six years, one month; the Shannon, four years, five months; the Shepherd, six years; the Twin City, four years, three months; the Speaker, five years, eleven months; and the Neuhas, six years.

The primary terms of all these leases were five years. Their terms had all expired by limitations, with the exception of Schnitzmeier, Shannon and Twin Cities, unless they had been renewed or validated. The three mentioned leases still had a short time to run. The terms of the latter three leases had elapsed prior to this action.

Following the release of the leases by the trustee Gillan, a new trust was formed with the defendants making new leases.

The position of the plaintiffs, appellants herein, on this appeal is (1) that the terms of the leases were complied with and are thus still in effect, and (2) that there has been a violation of the trust agreement by the release of the leases. They seek either a declaration of their trust interest in 87½ percent of the lease interests or damages in lieu thereof $530,000, as real damages and $150,000 as exemplary damages.

As to the other development work on the Cassady structure, on lands not within the trust, there was conflicting evidence as to whether or not commercial production of gas was had. In any event a well, known as Bronson—Agoretta No. 1, was drilled some miles away from the trust lands and a showing of gas was had. Plaintiffs contend that due to the peculiar nature of the lease agreement, commercial production of gas anywhere on the Cassady structure would validate and hold the leases for all time until a market was had. We do not feel it necessary to rule on whether or not the trial court was correct in finding that no commercial production was had. It appears from the record that of the leases originally secured by Bronson in the name of A. H. Raymond, all were not turned over to the trust after being

302

assigned to the Midwest Drilling Company, and when pressed for this reason, the plaintiff Bronson testified as follows:

"Q. Did the Midwest Drilling Company then assign to John D. Gillan, Trustee, all of the leases that A. H. Raymond assigned to the Midwest Drilling Company? A. No.

"Q. Why not, Mr. Bronson? A. Because we didn't want to carry all our eggs in one basket."

Thus, here this same plaintiff Bronson would seek to hold his interest in 22,000 acres in the trust land, by drilling some miles distant on other leases he held, leases that he didn't assign to the trust because he didn't want all his "eggs in one basket."

Plaintiffs put much emphasis on the peculiar form of the lease. The lease form provided:

"If a test well is not drilled on Lessor's land, but is drilled on other lands on said structure, then (unless the first well is a dry hole), lessee shall commence to drill a well on Lessor's land within two years from date of its completion  *  *  *"

It is conceded that the words "said structure" referred to the Cassady structure. The question presented then is whether the drilling any place on the Cassady structure outside of the trust lands would validate the trust leases. The answer is in the negative.

Plaintiffs contend that the entire block of leases formerly held by them on the 57,000 acres on the Cassady structure were unitized leases; and that the covenants as to drilling or paying rent were satisfied by activity anywhere on the Cassady structure. There was never any formal unitization agreement. If anything similar to a unit agreement can be found, it must be found from the leases themselves or the trust agreement or both.

The leases themselves had as their primary and sole consideration the prospects of royalty payments. In establishing the trust, these plaintiffs participated. It was the obvious intent of the parties that a separate unit was to be had of the trust lands on the Cassady structure and that any drilling that would fulfill the covenants under the leases as to the trust lands would be

done on those lands. Plaintiffs will not now be heard to insist that their private activities elsewhere than on the trust leases would renew and validate those leases. This would be true even if commercial production of gas was achieved on lands adjacent to the trust land. Severson v. Barstow, 103 Mont. 526, 63 Pac. (2d) 1022. See, also, 58 C.J.S., Mines & Minerals, section 218, page 555, and cases cited in note 9, including Kier Corporation v. Treasure Oil Co., 57 Cal. App. (2d) 829, 136 Pac. (2d) 59; also 40 C.J., Mines & Minerals, section 735, page 1106 and cases in note 6.

Plaintiffs assert that the case of Cowman v. Phillips Petroleum Co., 142 Kan. 762, 51 Pac. (2d) 988, should be controlling as to whether a lease may be extended over a particular tract of land beyond its fixed term by "production" on other land. The facts in that case clearly distinguish it from the case at bar.

Plaintiffs contend that the production of gas or oil in a well by the plaintiff Bronson, and described in the evidence as the "Bronson—Agoretta No. 1," validated the lease assigned to the trust. The evidence shows that the land on which this well was drilled is located some miles from the land leased by defendants.

It further appears that the jury, empanelled to try this case, gave answers to certain interrogatories submitted to them.

Interrogatory No. 1, and the answer thereto, reads as follows:

"Did the Defendants herein conspire together to take the trust property, and to appropriate the same to their own use and benefit and to deprive the Plaintiffs of their interest under the first Declaration of Trust? Answer: No. Clyde A. Ramer, Foreman."

Under R.C.M. 1947, section 93-216, in equity cases and in matters and proceedings of an equitable nature, the supreme court shall review all questions of fact arising upon the evidence as well as questions of law. The appellants' second point on this appeal that there has been a violation of the trust agreement by the release of the leases is without merit. We have carefully examined the testimony; and, while there is conflict in the evidence, there is sufficient evidence, if believed as it was

by the trial court and the jury sitting in an advisory capacity, to support the court's finding that there was no violation of the trust.

For the foregoing reasons, the judgment of the district court is affirmed.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES BOTTOMLY, ANGSTMAN and ADAIR, concur.